UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FRANKLIN C. EARL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO.: 4:12-cv-0035-DML-TWP |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security, ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## Decision on Judicial Review

Plaintiff Franklin C. Earl applied on January 2, 2007, for Disability Insurance Benefits (DIB) and Supplemental Security Income disability benefits (SSI) under Titles II and XVI, respectively, of the Social Security Act, alleging that he has been disabled since March 17, 2005.[1] Following a hearing before an administrative law judge on January 21, 2009, and the ALJ's unfavorable decision, Mr. Earl requested review by the national Appeals Council, which granted his request and remanded the case to the ALJ with instructions. A second hearing was held on May 18, 2011, after which the ALJ again found that Mr. Earl is not disabled. The Appeals Council denied review, rendering the ALJ's decision for the Commissioner final. Mr. Earl filed this civil action under 42 U.S.C. § 405(g) for

---

[1] Two programs of disability benefits are available under the Social Security Act: Disability Insurance Benefits under Title II of the Act for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income disability benefits under Title XVI of the Act for uninsured individuals who meet income and resources criteria, 42 U.S.C. § 1381 *et seq.*

review of the Commissioner's decision. The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

## Standard for Proving Disability

To prove disability, a claimant must show that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).[2] Mr. Earl is disabled if his impairments are of such severity that he is not able to perform the work he previously engaged in and, if based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if he is, then he is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The

---

[2] The court's citations to the Social Security Act and regulations promulgated by the Social Security Administration are those applicable to DIB benefits. For SSI disability benefits, materially identical provisions appear in Title XVI, 42 U.S.C. 1381 *et seq.*, and at 20 C.F.R. §§416.901-416.999.

third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to all the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on his age, work experience, and education (which are not considered at step four), and his RFC; if so, then he is not disabled.

The claimant bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

### **Standard for Review of the ALJ's Decision**

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential.  A court must affirm if no error of law occurred and if the findings are supported by substantial evidence.  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion.  *Id.*  The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence.  *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).  "Because the Commissioner is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, [a] Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled."  *Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999) (internal citation omitted).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability.  *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004).  The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that detracts from the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions.  *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

I. **The ALJ's Sequential Findings**

Mr. Earl was born in July 1970, was 35 years old as of his alleged onset date of disability, and was 40 years old at the time of the ALJ's decision issued July 11, 2011.

At step one, the ALJ found that Mr. Earl had engaged in substantial gainful activity through October 13, 2006, so the earliest possible onset of his disability is that date. Mr. Earl does not challenge that finding, and agrees that he worked as a truck driver through October 13, 2006. (Plaintiff's Opening Brief, Dkt. 12, at p. 4). At step two, the ALJ identified the following severe impairments: morbid obesity with a history of bariatric surgery, degenerative disc disease, osteoarthritis, chronic diarrhea, obstructive sleep apnea, and depression.[3] At step three, the ALJ evaluated Mr. Earl's severe impairments against various listings and found that none was met, a finding not challenged by Mr. Earl.

For purposes of steps four and five, the ALJ adopted the following residual functional capacity (RFC), which mirrors the opinion regarding RFC given at the hearing by medical examiner Dr. Fischer:

> Can: lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and walk two hours of an 8-hour work day and up to 30 minutes at a time and sit six hours total and up to two hours at a time, with ability to change position for five minutes each hour while remaining at the work station; occasionally bend, crouch, stoop, kneel, and squat; occasionally use foot controls; occasionally drive. Cannot

---

[3] Mr. Earl states that he has a diagnosis of irritable bowel syndrome and the limitations from this condition "may not be fully addressed by the diagnosis chronic diarrhea." (Dkt. 12 at p. 17). However, Mr. Earl does not cite to any medical diagnosis of irritable bowel syndrome; he cites to his self-report to a consultative examiner (R. 687) that he suffers from a "history of inflammatory bowel syndrome."

5

> crawl or climb ladders, ropes, scaffolds, or stairs. Should avoid unprotected heights and dangerous moving machinery and avoid concentrated exposure to humidity and temperature extremes. Finally, the work should require only simple, repetitive tasks with no strict production quotas, and be regular in expectations.

The ALJ determined that Mr. Earl was not capable of performing his past relevant work, which had been performed at the medium, or a greater, level of exertion. At step five and based on the opinion of a vocational expert, the ALJ decided that Mr. Earl is capable of performing the job functions of an eye glass assembler, table worker, or telephone quotation clerk, jobs that exist in significant numbers in Indiana and the national economy. Accordingly, the ALJ found that Mr. Earl is not disabled.

## II.    Mr. Earl's Assertions of Error

Mr. Earl's challenges to the ALJ's decision focus on the ALJ's rejection of the opinions of Mr. Earl's treating physician and that of an agency physician regarding Mr. Earl's functional capacity, and the ALJ's determination that Mr. Earl's descriptions of his limiting functions, which in part were supported by a statement of a friend, were not worthy of belief. These issues concern Mr. Earl's back pain and arthritis, his depression, and his bowel functioning. The court first summarizes the medical and other evidence relied on by the ALJ.

## III.    Evidence Regarding the Limiting Effects of Impairments

Mr. Earl testified that the problem most limiting his functioning concerns his bowels, and that his arthritis is a close second. The ALJ agreed that Mr. Earl's degenerative disc disease, osteoarthritis, and chronic diarrhea were severe

6

impairments, but he found that Mr. Earl's descriptions of the frequency and limiting effects of these impairments were not credible.

Mr. Earl had bariatric surgery in December 2010 and had lost 140 pounds as of the May 2011 administrative hearing.  He is 5'11" tall and had weighed 320 pounds in January 2007 and 385 pounds as of July 2008.  (R. 37).  Mr. Earl testified that since his surgery and significant weight loss, he had noticed no change in his arthritis pain or his bowel problems.

### A.  Back Problems, Arthritis, and Pain

The ALJ traced the medical history regarding Mr. Earl's back pain and degenerative arthritis from 2005 through 2011.  In 2005, Mr. Earl reported to Dr. Towriss, his primary care physician, that he felt lower back pain that radiated down his right leg.  An MRI revealed a mild encroachment of a disc on the thecal sac at L3-4 and mild degenerative disease. Mr. Earl had a consultation with a specialist in neurological surgery, who recommended that Mr. Earl lose weight and referred him to the pain clinic.  Mr. Earl underwent facet injections and radiofrequency ablation in March and April 2005, and when he was seen at the pain clinic in May 2005, he reported no pain at the present, and that pain occurred only if he sat or drove too long or when he raised from a sitting to standing position. Even then, the pain resolved quickly.  Mr. Earl was referred to Vocational Rehabilitation and was told to return to the pain clinic as needed.  There was no evidence that Mr. Earl returned to the pain clinic.

About two years later, Mr. Earl reported pain in his left ankle, which showed some swelling, but an x-ray showed only minor osteoarthritic change, and the pain improved with orthotics.  Dr. Towriss completed a residual functional capacity form on November 26, 2007, and opined that Mr. Earl can lift and carry only 10 pounds occasionally and has no ability to lift and carry on a frequent basis because of lumbar spondylosis. He also stated that Mr. Earl could only rarely engage in postural activities (stooping, bending, crawling, climbing) and his back issues and obesity limit him to walking and standing less than two hours in a work day, and sitting only up to one hour at a time.  (R. 39).

In July 2008, Mr. Earl saw a rheumatologist, to whom he described pain in his feet, ankles, knees, hands, elbows, and shoulders.  X-rays taken of his hands and feet were negative and physical examination findings were not consistent with fibromyalgia.  Mr. Earl was told to take anti-inflammatory medication and a follow-up examination was recommended for six months hence, though there is no record that Mr. Earl followed up with the rheumatologist.  In November 2008, Mr. Earl saw his primary care physician and reported bilateral knee pain to Dr. Towriss.  X-rays showed mild osteoarthritic changes.

About 2 ½ years later, in March 2011, Mr. Earl was seen by a state agency doctor (Dr. Karen Reid-Renner) for a consultative physical examination.  He told Dr. Reid-Renner that he has had back problems since the 1990s that became worse in 2004 to the degree that affected his ability to work.  He reported that the back problems limit his ability to stand for more than five minutes; at that point he

experiences pain in his feet and knees and back and becomes short of breath. He also told her that he can walk for only five minutes before becoming short of breath, can sit for only ten minutes before he needs to change position, and needs a cane to walk. (R. 687). At the exam, Mr. Earl walked with a slight limp and had a cane, but the doctor stated he "was not, however, terribly antalgic," was not "ataxic," had no swelling of his joints, and had a steady gait.[4] (R. 38, 688). There was no evidence of any motor deficit or sensory deficit, and he had good fine motor function and good grip strength. (*Id.*). Dr. Reid-Renner completed a document regarding Mr. Earl's ability to do work-related physical activities, and reported extraordinarily restrictive physical limitations. (R. 691-696). Her opinion contrasted with the report from an earlier state-agency consultative examination in May 2007, in which Dr. Akaydin opined that Mr. Earl had the ability to perform mildly to moderately strenuous work without difficulty and that he is an excellent candidate for vocational rehabilitation. (R. 39).

    Dr. Fischer, the medical expert at the May 2011 hearing, testified that the evidence indicates Mr. Earl is physically capable of activity that is consistent with a job in which walking or standing is limited to two hours, sitting is limited to six hours, and other lifting and handling, postural, and environmental restrictions are followed. He also commented that although the claimant had a cane at the consultative examination, nothing in the record indicates a physician had

---

[4] An antalgic gait is one characterized by a limp adopted to avoid pain on weight-bearing structures. An ataxic gait is one that appears unsteady and uncoordinated with the feet thrown out as a wide base. *See* http://medical-dictionary.thefreedictionary.com/gait (last visited March 6, 2013).

prescribed the cane, and that the medical findings indicate that Mr. Earl does not need the cane for ambulation. (R. 40).

### B. Poor Bowel Functioning

The ALJ also traced the history of Mr. Earl's reports of his poor bowel functioning and noted that the record documented complaints of recurrent diarrhea and stomach pain as early as 1997. A gastrointestinal study was performed in October 2002 but was negative for any disease. Dr. Towriss has prescribed medication, with some success, and at one point stated that Mr. Earl needs medication (Lotomil) to stay regular. Mr. Earl testified that his bowel problems are unpredictable and that he goes to the bathroom at least twice per day and sometimes up to 15 times, and that he must spend up to an hour in the bathroom each time. Mr. Earl said his bathroom trips are unpredictable, medication does not help, that a "15-time" day had occurred three or four months before the administrative hearing, and he suffers through a day with frequent bathroom trips as often as every week or two. (R. 38).

The Indiana Family and Social Services Administration found Mr. Earl disabled under its rules for determining that a person meets the criteria for Medical Assistance to the Disabled, and apparently based its decision principally on the effects of Mr. Earl's bowel problems. Dr. Towriss had submitted a report to Indiana FSSA dated September 18, 2006, which listed diagnoses of recurrent, chronic diarrhea, degenerative disc disease, leg pain, and depression, and opined that Mr. Earl's diarrhea caused his inability to work. (R. 39).

Mr. Earl provided a statement by a friend, Bradley McCammon, who wrote in January 2007 that Mr. Earl's cramps and bowel problems limit his social activities. The ALJ declined to give this statement much weight because Mr. McCammon had very limited contact with Mr. Earl, seeing him only at church. (R. 38).

The ALJ described a note that Dr. Towriss authored in June 2009 in connection with his meeting with Mr. Earl's attorney regarding the ALJ's 2009 initial unfavorable disability decision. Dr. Towriss stated that the ALJ had not understood the extent of Mr. Earl's diarrhea problem, and that the diarrhea problem significantly limits any attempt to work, has been persistent despite medication and referral to gastroenterologists, and that this problem (along with depression and his weight) renders him not capable of work on a regular, sustained basis. (R. 39, 677).

### IV.  Physical Capabilities

In deciding that Mr. Earl is capable of work involving sitting for six hours and standing or walking for two hours in a work day, with some limits on his postural activities, the ALJ relied on the May 2011 hearing testimony of a medical expert and the March 2007 report from his consultative physical examination by Dr. Akaydin. The latter report concluded that Mr. Earl "should be quite capable of performing most forms of at least mildly to moderately physically strenuous type work without any overt difficulty whatsoever." (R. 476). The ALJ rejected the contrary views of Dr. Towriss, the treating physician, expressed in a November 26,

2007 functional capacity assessment and of Dr. Reid-Renner, who conducted a consultative physical examination in March 2011.

The weight an ALJ gives to medical opinions is guided by factors described in 20 C.F.R. § 404.1527(b)(2). As a treating physician, Dr. Towriss's opinion was entitled to controlling weight *if* well supported by medically acceptable techniques and not inconsistent with other substantial evidence. *Id.* § 404.1527(d)(2). If a treating physician's opinion is not entitled to controlling weight, then it must be evaluated using the same factors relevant to weighing other medical opinions. That is, the ALJ decides the weight to accord it based on the degree to which a medical opinion (a) is supported by relevant evidence and explanations; (b) considered all evidence pertinent to the claimant's claim; (c) is consistent with the record as a whole; and (d) is supported or contradicted by any other factors. *Id.* § 404.1527(d)(3)-(6). The physician's field of specialty and the nature and extent of her treatment relationship with the claimant are also considered. *Id.* 404.1527(d)(1), (2), and (5).

The ALJ decided that Dr. Towriss's opinion was not entitled to controlling weight, and was worth little weight, for three reasons: (1) its inconsistency with the overall record evidence, (2) the medical studies in the record (x-rays) do not document significant degenerative disease, and (3) the tests of Mr. Earl's physical abilities during consultative examinations did not document significant motor deficits and his range of motion was found to be generally within normal limits. (R. 40). As one example, Dr. Towriss's November 2007 report states that Mr. Earl only

12

rarely is capable of handling items (gross manipulation) and fingering items (fine manipulation), yet the physical findings from examinations showed no significant motor deficits and range of motion within normal limits. (R. 40). He determined that Dr. Reid-Renner's opinion of significant limitations (such as that Mr. Earl can sit or walk only 10 minutes at one time without interruption and can stand only 5 minutes at a time) was inconsistent with her own examination. He also noted that her list of Mr. Earl's capabilities "relied quite heavily" on Mr. Earl's subjective reports to her and that she "seemed to uncritically accept" them as true. The ALJ's conclusion is a rational one to draw from reading Dr. Reid-Renner's report. Dr. Reid-Renner, in fact, recorded Mr. Earl's 10 minutes and 5 minutes limitations, even though she had contrasted them against her own observations that Mr. Earl "was not, however, terribly antalgic," not ataxic, had no swelling in his joints, had a steady gait, and she had found no evidence of any motor deficit. (R. 687). The ALJ's decision to reject Dr. Towriss's and Dr. Reid-Renner's views and instead accept the medical opinion of Dr. Akaydin who, like Dr. Reid-Renner, had conducted a physical examination, and the medical opinion provided at the hearing by Dr. Fischer, who had reviewed the entire record, must be accepted by the court because it is supported by substantial evidence. Mr. Earl has not demonstrated that the ALJ committed a legal error or that his weighing of the medical opinions in the record reflects serious factual mistakes or omissions.

## V. Mental Limitations

The ALJ found that Mr. Earl has a history of depression that has been treated with medication prescribed by Dr. Towriss. In a note dated June 2009 following the ALJ's initial denial of benefits, Dr. Towriss stated, in a conclusory fashion, that "I believe that Mr. Earl's depression would seriously interfere with his ability to pay attention on a job; to maintain concentration; to complete tasks; and, to maintain a competitive pace." (R. 677). Dr. Towriss explained that the depression was secondary to Mr. Earl's "inability to work and his frustration at being unable to provide for his family." (*Id.*). In assessing the severity of Mr. Earl's depression and its resultant functional limitations, the ALJ discussed this note, Dr. Towriss's treatment history (which had first mentioned a mental impairment in a report prepared for Mr. Earl's application for Medicaid), the report of a state-agency consultative psychologist, and the hearing testimony of a psychologist (Dr. Olive, Ph.D.) who had reviewed the entire record and discussed the evidence of mental limitations in light of Mr. Earl's activities of daily living, social functioning, ability to maintain concentration, persistence, or pace, and the absence of any episodes of decompensation.

Given the specificity of the analysis provided by Dr. Olive after reviewing the entire medical record, and Dr. Olive's explanation that the effects of Mr. Earl's depression on his pace and concentration could be accommodated by a job requiring only simple, repetitive tasks with no strict production quotas and that is "regular in expectations," the court can discern no legal error or serious factual mistake in the

ALJ's decision to adopt these limitations as part of Mr. Earl's RFC. Indeed, the ALJ found that these accommodations were not necessarily inconsistent with Dr. Towriss's opinion that depression would "seriously interfere" with concentration, persistence, and pace, which, given the generality of Dr. Towriss's statement, the court finds an acceptable view of the evidence.

VI.     **Functional Limits Caused by Diarrhea**

The ALJ reasonably stated that "the main issue in this case is probably the claimant's chronic diarrhea." (R. 40). Certainly, if Mr. Earl's own description of his unpredictable but frequent need to use the restroom is credited, then he cannot maintain competitive employment of 40 hours per week. As Dr. Towriss stated, the condition was "simply incapacitating" because Mr. Earl "needs to be nearby a restroom at virtually all times and will need frequent unscheduled breaks from any routine to attend to restroom needs." (R. 677)

The ALJ, however, did not believe the evidence supported this level of dysfunction and, instead determined that Mr. Earl did not require special job accommodations because of chronic diarrhea. In doing so, the ALJ relied on the hearing testimony of Dr. Fischer and found that Mr. Earl was not believable. The ALJ assessed the credibility of the testimony—whether from Mr. Earl, Dr. Towriss, or Mr. Earl's friend—about the necessity for Mr. Earl to spend so much time, and at unpredictable times, in the bathroom by contrasting it with the following evidence, or lack thereof. First, the ALJ noted that Mr. Earl had worked at a level of substantial gainful activity during periods of time in which, according to Mr. Earl,

15

he was suffering from chronic diarrhea. Second, he found that the record did not establish that the problem had worsened after Mr. Earl stopped working.  Third, he found the friend's statement from 2007 unpersuasive because the friend did not spend sufficient time with Mr. Earl to know how Mr. Earl was affected in his daily life. Fourth, he found that the medical evidence did not reflect a disease-like or physical abnormality-based reason for the diarrhea.  An upper GI in 2002 was normal, and there were no more recent abdominal studies or a referral to a gastrointestinal specialist.  The ALJ reasoned that if the problem were as persistent, unpredictable, and debilitating as Mr. Earl described (sometimes 15 hours in a day in the bathroom and the near inability ever to do anything socially or otherwise), then something documenting the worsening of Mr. Earl's symptoms or testing or studies or evaluation by a specialist after 2002 "might be expected."  (R. 40).   Fifth, the ALJ—relying on Dr. Fischer's testimony regarding Dr. Towriss's progress notes—summarized that the notes "did not support diarrhea of the frequency alleged" by Mr. Earl; "[i]n fact, at least one-half of Dr. Towriss's progress notes do not mention diarrhea or list diarrhea in the diagnoses," and the last progress note is dated November 2008. (*Id.*)

These bases for doubting Mr. Earl's credibility and the alleged severity, frequency, and debilitating effects of his diarrhea are adequate.[5]  An ALJ is not

---

[5] The fact that Indiana FSSA believed that Mr. Earl's diarrhea was of such severity and frequency that it interfered with his ability to work is not material. Fundamentally, the severity, frequency, and limiting effects of the diarrhea is a question of Mr. Earl's credibility—whether reflected in his statements to the ALJ or

16

required to accept the claimant's statements about his symptoms and how they affect his daily life and ability to work. *Rucker v. Chater,* 92 F.3d 492, 496 (7th Cir. 1996). The ALJ must consider the claimant's statements in light of the relevant objective medical evidence, as well as any evidence regarding daily activities, precipitating or aggravating factors, effectiveness or side effects of medication, treatment for relief of symptoms, and the existence of any other measures to relieve symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must give reasons for the weight he gives to the claimant's statements so that the claimant and subsequent reviewers have a fair sense of how the claimant's descriptions were assessed. *See* SSR 96-7p; *Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination).[6] The ALJ followed these guidelines, and the court cannot say that his evaluation is without logical support in the record and patently wrong. *See Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008)

---

otherwise to the SSA, his statements to Dr. Towriss or consultative physicians, or to his friends. The ALJ was not required to believe Mr. Earl.

[6] As Mr. Earl points out, the ALJ's decision contains some boilerplate regarding credibility that has been a favorite of ALJs and has been frequently, and rightly, criticized as meaningless and illogical. *Bjornson v. Astrue,* 671 F.3d 640, 645-46 (7th Cir. 2012) (discussing boilerplate statement that ALJ has found the claimant not credible to the extent his statements are inconsistent with the RFC). The use of such boilerplate is not, however, grounds for reversal or remand where the ALJ's decision otherwise documents the reasons the ALJ decided not to accept as credible a claimant's statements—whether given at a hearing, or to a doctor, or to a friend. *See Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012) (the inclusion of the boilerplate language rejecting as not credible statements that are inconsistent with an RFC is harmless if "the ALJ has otherwise explained his conclusion adequately").

(because ALJ is in best position to evaluate a claimant's credibility, ALJ's assessment is reviewed deferentially and will not be set aside unless it is "patently wrong"); *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir. 1994) (court owes special deference to the ALJ's assessment of the credibility of the claimant's descriptions of his symptoms and their limiting effects).

## Conclusion

The standard of review is very narrow. The residual functional capacity determined by the ALJ is supported by substantial evidence and is not infected by legal errors or serious misstatements of facts. With that RFC and based on the testimony of the vocational expert, it was reasonable for the ALJ to determine that there are jobs in sufficient numbers in the national economy that Mr. Earl can perform. Accordingly, the Commissioner's decision is AFFIRMED.

So ORDERED.

Date: 03/13/2013

*Debra McVicker Lynch*
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system